**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MAXIM INC. and MAXIM LICENSING, INC.,

        *Plaintiffs*,

                v.

PLAYBOY, INC.,

        *Defendant*.

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Maxim Inc. and Maxim Licensing, Inc. (together, "Maxim" or "Plaintiffs") by and through their attorneys Clark Smith Villazor LLP bring this action against Defendant Playboy, Inc. ("Playboy") and allege as follows:

### NATURE OF THIS ACTION

1.  This action arises from Playboy's willful misappropriation, copyright infringement, and misuse of Maxim's confidential, proprietary, and trade secret information and technologies that Maxim created to improve its market-leading online modeling contests. Playboy unlawfully reproduced Maxim's competition mechanics and architecture and unlawfully copied Maxim's copyrighted competition rules and competition platform to launch a copycat product and compete unfairly against Maxim to Maxim's substantial detriment and harm.

2.  Maxim is a multimedia lifestyle brand and publishing company that, since 2018, has run an acclaimed modeling contest, the Maxim Cover Girl Competition (the "Competition"). The Competition has generated substantial consumer engagement and revenue for Maxim and has enhanced Maxim's brand recognition.

3.      Not satisfied with the financial and reputational success of its Competition, Maxim identified limitations with legacy online modeling contests and then invested significant time, capital, and technical expertise beginning in 2024 to design and build a new, proprietary competition ecosystem.

4.      Using the technologies and solutions it had developed to solve thorny problems in the online contest space, Maxim launched its updated Competition in early 2025 (https://covergirl.maxim.com/).

5.      Maxim's redesigned competition platform integrates novel and confidential elements, including proprietary tournament formatting, ranking and voting mechanics; vote-linked media bundles that monetize contestants' modeling photographs and user generated content ("UGC"); and a distinctive master rules and promotion rules architecture engineered to ensure legal compliance and consumer transparency.

6.      Maxim memorialized its novel processes and methodologies in rules that govern its competitions and obtained copyright registrations for these rules.

7.      Maxim's proprietary competition elements, individually and in combination, are novel developments, were closely guarded by Maxim, and were not publicly known or available prior to when Maxim rolled out its improved Competition in 2025. They have derived independent economic value from their confidentiality and from Maxim's exclusive control over their implementation.

8.      Playboy is one of Maxim's longstanding competitors. Like Maxim, Playboy publishes a lifestyle magazine and maintains an online presence where it distributes its lifestyle content. Observing the success of the Competition and recognizing how such a product can boost revenues and brand recognition, Playboy embarked on an intentional and deliberate scheme to

misappropriate and exploit Maxim's proprietary technologies and information. Rather than engage in the costly effort of building its own online competition platform from scratch, Playboy decided to cut costs, short-circuit the otherwise time-consuming development process, and build a replica derived from Maxim's copied components.

9.      In or around 2025, Playboy improperly accessed Maxim's platform and copied Maxim's proprietary processes, technologies, and copyrighted works. Playboy did so by registering dummy accounts with Maxim's Competition, disregarding Maxim's terms of service that prohibited Playboy from misusing Maxim's intellectual property, and then duplicating Maxim's proprietary and confidential competition features, mechanics, and innovations.

10.     With the proprietary information that Playboy accessed and misappropriated, Playboy created a copycat competitor product to Maxim's Competition: The Great Playmate Search (https://contests.playboy.com/). Playboy launched The Great Playmate Search to the public in the summer of 2025 and intends to run this contest against in early 2026.

11.     Playboy's copying was pervasive, willful, and brazen. Playboy reproduced Maxim's website, competition dashboard, and mobile interface, including the layout, structure, and navigation of various Competition webpages and components.

12.     Playboy reproduced Maxim's copyrighted competition rules. Portions of the rules governing Playboy's online competition are virtually identical copies of relevant portions of Maxim's rules. For example, the overview of Playboy's Master Rules and Promotion Rules:

**Updated: 08/04/25**

**Playboys Master Rules and Promotion Rules**

Contents

    A. Current Promotions
    B. Playboy Master Rules

**A.  Current Promotions**

Following is a list of the Promotions currently running at https://contests.playboy.com/. This list of Promotions will be updated as Promotions end and new Promotions are launched.

- **The Great Playmate Search - Playmate**
  - **Promotion ID**: 250714-01
  - **Promotion Period**: The Promotion opens at 6:00 PM Pacific Daylight Time ("PST") on August 04, 2025 and closes at 6:00 PM PST on December 07, 2025.
  - **Promotion Rules URL**: https://contests.playboy.com/rules/playmate.pdf

- **The Great Playmate Search - Inside Cover**
  - **Promotion ID**: 250714-02
  - **Promotion Period**: The Promotion opens at 6:00 PM Pacific Daylight Time ("PST") on August 04, 2025 and closes at 6:00 PM PST on December 07, 2025.
  - **Promotion Rules URL**: https://contests.playboy.com/rules/inside-cover.pdf

is substantially similar to and directly derived from the overview of Maxim's Master Rules and Promotion Rules:

**Maxim Master Rules and Promotion Rules**
**(Revised January 6, 2025)**

Following is a list of the Promotions currently running at https://covergirl.maxim.com and the Maxim Master Rules which apply to all Promotions.

Contents

    A. Current Promotions
    B. Maxim Master Rules

**A. Current Promotions**

Following is a list of the Promotions currently running at https://covergirl.maxim.com. This list of Promotions will be updated as Promotions end and new Promotions are launched.

- The MAXIM Cover Girl 2025 Competition
  - **Promotion ID**: 1
  - **Promotion Period**: The Promotion begins at 9:00 p.m. Eastern Time ("ET") on January 6, 2025 and ends at 9:00 p.m. ET on July 17, 2025
  - **Promotion Rules URL**: http://covergirl.maxim.com/rules/cover-girl-2025-competition

13.    The promotion period and entry method of Playboy's Master Rules and

Promotion Rules:

> 4.1.    **Promotion Periods.** The start and end dates of a Promotion shall be listed in the applicable Promotion Rules (each a "Promotion Period"). The Sponsor's designated server will be the official timekeeper for the Promotions.
>
> 4.2.    **Entry Method.** Follow the entry instructions outlined in the Promotion Rules during the specified Promotion Period. Entrants must follow all instructions and rules in the Promotion Rules, follow the submission requirements set forth below, and comply in all respects with the Official Rules. All Entries are subject to review and acceptance by Sponsor and/or Promotion Administrator. By submitting an Entry, each Entrant represents that his/her Entry conforms to the submission guidelines set forth below and with all of the Official Rules, and the Entrant agrees that the Promotion Administrator, in its sole discretion, may remove his/her Entry and disqualify the Entrant from any Promotion if it believes, in its sole discretion, that the Entry fails to conform to the submission requirements or to the Official Rules in any way.

is substantially similar to and directly derived from the promotion period and entry method of

Maxim's Master Rules and Promotion Rules:

> 6.    **Promotion Periods:** The start and end dates of a Promotion shall be listed in the applicable Promotion Rules (each a "**Promotion Period**"). The Sponsor's designated server will be the official timekeeper for the Promotions.
>
> 7.    **How to Enter a Promotion:** Follow the entry instructions outlined in the Promotion Rules during the specified Promotion Period. Entrants must follow all instructions and rules in the Promotion Rules, follow the submission requirements set forth below, and comply in all respects with the Official Rules. All Entries are subject to review and acceptance by Sponsor and/or Promotion Administrator. By submitting an Entry, each Entrant represents that his/her Entry conforms to the submission guidelines set forth below and with all of the Official Rules, and the Entrant agrees that the Promotion Administrator, in its sole discretion, may remove his/her Entry and disqualify the Entrant from any Promotion if it believes, in its sole discretion, that the Entry fails to conform to the submission requirements or to the Official Rules in any way.

14.    And the panel judging approach of Playboy's The Great Playmate Search

Playmate Promotion Rules and Inside Cover Promotion Rules:

> d.    **Phase 4– Panel Judging.** This Phase runs between 12/03/2025 and 12/09/2025. Each of the thirty (30) Championship Fan Vote Winners will participate in a video-conference interview.
>
> During this Phase, a panel of qualified judges working under the supervision of the Promotion Administrator, an independent judging organization will evaluate every Entry, interview, and profile against the following factors: Playboy model potential, authenticity, modeling skill, professionalism, iconicity, range/versatility, charisma, and creativity (collectively, the "Panel Judging Criteria"). Judges may assign numerical scores or ratings for each factor, or an overall evaluation, in their sole discretion. The Criteria are applied uniformly to all eligible Entries.
>
> The Entry with the highest aggregate score becomes the "**Championship Winner.**" **Runner-Ups.** The twenty (20) Entries with the next-highest scores (2nd through 21st place) are designated "**Championship Runner-Ups.**"
>
> If a tie occurs, the tied Entries will be re-evaluated using the Panel Judging Criteria. Should the tie persist, the Entry with the higher score in the first listed Criterion prevails; if still tied, judges will proceed sequentially through the remaining Criteria until the tie is resolved.

is substantially similar to and directly derived from Maxim's Cover Girl 2025 Competition

Promotion Rules:

> b. **Phase 2: Grand Finals Round**. This Round will run between 03/06/2025 and 06/19/2025. In this Phase there will be three (3) Groups composed of Finals Winners. Each Finals Winner will participate in a video conference Interview.
>
> During this Round each Finals Winner's Entry, Interview, and Profile will be judged by qualified judges, under the supervision of Promotion Administrator, an independent judging organization, on the basis of the following: Maxim cover model potential, authenticity, modeling skill, professionalism, iconicity, range/versatility, charisma, and creativity (collectively the "**Grand Finals Judging Criteria**").
>
> The Finals Winner who receives the highest total score within their Group based on the Grand Finals Judging Criteria shall be deemed a "**Grand Finals Winner**". A total of three (3) Grand Finals Winners will be selected. The Grand Finals Winners will be determined between 03/06/2025 and 06/27/2025 in San Antonio, Texas.
>
> In the event of a tie within any Group, each tied Finals Winner's Entry, Interview, and Profile will be re-judged by the judges using the Grand Finals Judging Criteria. If there is a subsequent tie, the tie breaker will be based upon the highest score in the first Grand Finals Judging Criterion, continuing thereafter to each Grand Finals Judging Criterion in order, as needed, to break the tie.

15.    Playboy's misconduct harmed and continues to harm Maxim in multiple ways.

Playboy has taken Maxim's confidential contest system, reproduced it under its own brand, and

falsely marketed these copied innovations as Playboy's own.

16.    In copying core Maxim components, Playboy compounded its harms by also

rolling out defective and misleading features. Playboy labeled its copied products as "paid

votes," which are commonly associated with deceptive or unlawful "pay-to-win" schemes.

Playboy also launched its contests with hidden rules and premature votes. This has created

confusion among contestants and voters alike, thereby eroding consumer trust in the online

competition industry and stigmatizing Maxim's reputation, brand equity, and competitive

advantage by association.

17.    Maxim thus seeks to hold Playboy accountable for its theft and exploitation of

Maxim's proprietary trade secret and confidential information. Because the resulting and

ongoing loss of trade secrets, goodwill, and market leadership cannot be remedied by monetary

damages alone, Maxim also seeks injunctive relief to halt Playboy's ongoing misuse of Maxim's

proprietary and copyrighted works, to restore lawful competition, and to prevent further irreparable injury caused by Playboy's deliberate and unauthorized copying of Maxim's proprietary works.

## THE PARTIES

18.    Plaintiff Maxim Inc. is a Delaware corporation with its principal place of business in New York, New York.

19.    Plaintiff Maxim Licensing, Inc. is a Delaware corporation with its principal place of business in San Antonio, Texas. Maxim Licensing, Inc. is a wholly-owned subsidiary of Maxim Inc.

20.    Defendant Playboy, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

## JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under federal law—the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Digital Millennium Copyright Act, 17 U.S.C. § 1202 *et seq.*—and supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367.

22.    The Court has personal jurisdiction over Playboy in this action because Playboy has sufficient minimum contacts with New York State and maintenance of suit against it will not offend traditional notions of fair play and substantial justice.

23.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, omissions, and injuries giving rise to the claims—including Playboy's unauthorized and unlawful appropriation of Maxim's proprietary trade secret and confidential information— occurred in this district, Maxim's Terms of Service that Playboy breached contain a mandatory

forum selection clause in favor of this district for disputes regarding intellectual property ownership and use, and Playboy is subject to personal jurisdiction in this district at the time this action was commenced.

## FACTUAL ALLEGATIONS

### I.    Maxim and the Cover Girl Competition

24.    Maxim is a multimedia company whose printed publications and digital platforms cover culture, lifestyle, fashion, entertainment, sports, travel, gear, and luxury.

25.    In 1995, Maxim launched its eponymous magazine, which has been published in New York City since 1997. Maxim's magazine is one of the country's leading lifestyle magazines with a circulation of several million readers each month. The magazine is also published in multiple foreign language editions around the world. The magazine is widely known for its photography and has featured notable models and entertainers like Cindy Crawford, Shania Twain, Taylor Swift, Katy Perry, and Beyoncé.

26.    Maxim also maintains a robust online and social media presence where it displays and distributes its lifestyle content, including on its website, https://www.maxim.com/, and through its accounts across various social media platforms like Facebook and Instagram. Maxim's website generates several million unique viewers each month.

27.    In addition to its print publications and digital presence, Maxim runs the Cover Girl Competition, an annual modeling contest that it launched in 2018. The Competition invites aspiring female models, social media influencers, and actresses from around the world to compete for an appearance on the cover of Maxim's magazine, win cash prizes—Maxim will award over $500,000 for the 2025 Competition—and receive promotional opportunities tied to Maxim's brand.

28.    Prospective contestants register online for the Competition through a website portal that prominently and conspicuously directs them to agree to Maxim's governing rules, terms, and conditions. Prospective contestants are required to enter identifying information into a form, including their email, mobile number, and date of birth, and are also prompted to upload their photographs into the contest.

29.    All Competition pages, including the home page (https://covergirl.maxim.com/), accessible to participants and voters alike, contain a link to the Competition Terms of Service agreement (https://covergirl.maxim.com/tos) (the "Terms of Service").

30.    The Competition registration page includes a hyperlink to the Terms of Service, which provides that "[b]y registering, you agree to the site Rules, Terms of Service, and Privacy Policy," and requires registrants to click on "I Agree" to complete their registration. Prospective contestants register their consent and agree to be bound by these rules, terms, and conditions by clicking the indicated "I Agree" button.

31.    The Competition registration page includes a hyperlink to the Terms of Service, which provides that "[b]y registering, you agree to the site Rules, Terms of Service, and Privacy Policy," and requires registrants to click on "I Agree" to complete their registration. Prospective contestants register their consent and agree to be bound by these rules, terms, and conditions by clicking the indicated "I Agree" button.

32.    As expressly stated in the Terms of Service, individuals who enter the Competition website are bound thereby:

> YOUR CONTINUED USE OF THIS WEBSITE CONSTITUTES YOUR AGREEMENT TO THESE TERMS OF SERVICE. If at any time you do not agree to these Terms of Service, please do not use this Website.

33.    With respect to Maxim's intellectual property, the Terms of Service provide the following agreement and use restrictions:

You acknowledge and agree that all of our trademarks, logos, copyrights and any and all other intellectual property rights in all material or content contained within this Website shall remain at all times vested in us or, in the case where we are using such material or content under authority from a third party, in the owner of such material or content.

We grant you the limited right to access and make use of the Website as our customer. However, you shall not: (a) reproduce, duplicate, copy, sell or otherwise exploit the Website or any image, page layout, page design, trade dress, trademark, logo or other content ("Website Content") for any commercial purpose; (b) use a robot, spider or data mining or extraction tool or process to monitor, extract or copy Website Content; (c) use any meta tags, search terms, key terms, or the like that contain the Website's name or our trademarks; (d) engage in any activity that interferes with the Website or another user's ability to use the Website; (e) modify, create derivative works from, reverse engineer, decompile or disassemble any technology used to provide the Website and the goods or services offered on the Website; or (f) assist or encourage any third party in engaging in any activity prohibited by these Terms of Service.

You shall not use, copy, distribute, or exploit any of the Website Content in any manner without our prior written permission.

34.    The "Governing Law" section of the Terms of Service provides that:

You agree that all matters relating to any claim or dispute, all matters relating to or arising under these Terms of Service, the modeling competition, our Privacy Policy, any transaction made through this Website, our products and services, cookie policy, advertising, sharing of data or the Website in general will be governed in accordance with the laws of the United States and the State of New York without regard to conflict of law provisions. You also agree that any dispute that is not subject to arbitration or eligible for small claims actions shall be decided exclusively by a court of competent jurisdiction located in Supreme Court, State of New York, County of New York or the United States District Court for the Southern District of New York and that you waive all objections to such jurisdiction and venue.

35.    Maxim's contest landing page contains the following copyright management

information ("CMI"):



36.     Maxim's Master Rules and Promotion Rules have this CMI:

© Pacific Digital Industries, Inc. DBA SweepstakesPros. All rights reserved. (ver. 20250106)

37.     Maxim's Cover Girl 2025 Competition Promotion Rules have this CMI:

© Pacific Digital Industries, Inc. DBA SweepstakesPros. All rights reserved. (ver. 20250106)

38.     Maxim is the assignee of SweepstakesPros's copyright rights in the rules governing Maxim's online competitions and contests, including the Competition.

## II.     Maxim and Its Proprietary and Trade Secret Information

39.     In 2023 and early 2024, Maxim ran the Competition on a third-party website. Maxim determined that using third-party platforms for online contests posed technical and financial drawbacks. Maxim also determined that monetizing and scaling its online contests through proprietary approaches presented lucrative opportunities. Maxim sought to do this while ensuring that its contests would not run afoul of applicable laws and regulations regarding gambling, lotteries, and sweepstakes.

40.     In 2024, Maxim invested additional money, time, and effort to innovate in this space and develop a proprietary online competition platform and associated technologies and rules to support Maxim's various contests, including the Competition.

41.     In the process, Maxim designed, developed, and deployed novel technical solutions to the difficult problems that it had identified, including how to better monetize online competitions, retain participants, and engage voters (collectively, the "Competition Mechanics").

42.     Of Maxim's Competition Mechanics, one novel process, procedure, and methodology at the core of Maxim's innovation in online competitions is its sale of "user generated content media bundles." Competition participants submit their UGC to Maxim in the

form of modeling photographs. Maxim uses its proprietary algorithms to score and rank the UGC and then sells the content in media bundles to voters. Sales of these bundles generate competition votes for the participants whose UGC is sold. Competitors' efforts to obtain votes in this manner constitute a skill-based activity that distinguishes Maxim's contest platform from traditional "pay-to-win" contests, where votes are simply exchanged for payments.

43.     Other Competition Mechanics and Maxim's proprietary solutions to online competitions are "parallel voting tournaments," "rolling entry tournaments," and "overtime voting extensions." These novel processes, procedures, and methods create immediate, multiple, and ongoing competition rounds, which increase competitor engagement and retention, voter participation, and competition monetization. These proprietary processes are distinct from traditional tournaments, which generally feature fixed and self-contained tournament rounds or brackets.

44.     Maxim also created a proprietary solution of "robot voting." This voting system assigns default votes to competitors based on facial analysis and photo quality, thereby preventing inactive contestants from distorting perceived results.

45.     Maxim's proprietary processes, procedures, and methodologies are the subject of one or more pending patent applications. The contents of these applications are not available to or known by the public.

46.     Maxim has taken reasonable measures to keep its proprietary processes, procedures, and methodologies secret and confidential. Maxim limits physical and computer system access to the Competition Mechanics to only a small number of Maxim employees who have a business need to know the information.

47.     Maxim's proprietary processes, procedures, and methodologies derive independent economic value to Maxim, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

48.     By early 2025, Maxim launched three parallel Cover Girl Competitions using its novel proprietary technologies. Within weeks, contestants were purchasing thousands of digital bundles, generating significant revenue for Maxim, and demonstrating the success of Maxim's unique online competition platform and associated technologies.

### III.    Maxim and Its Copyrighted Works

49.     Maxim and its predecessors in interest also invested substantial time, money, and effort to develop copyrightable works used in operating and marketing the Competition.

50.     Maxim has obtained the following certificates of registration from the Office for its works (together, the "Copyrighted Works"):

      a.     Certificate of Registration TX 9-552-774 for the Maxim Master Rules and Promotion Rules as of January 6, 2025;

      b.     Certificate of Registration TX 9-553-279 for the Maxim Cover Girl 2025 Competition Promotion Rules as of January 6, 2025;

      c.     Certificate of Registration TX0009540511 for the Maxim 2025 Competition Rules as of January 7, 2025;

      d.     Certificate of Registration TXu002515323 for the Maxim Competition website as of January 7, 2025;

      e.     Certificate of Registration TXu002516189 for the Maxim Competition website as of July 31, 2025.

51.    Maxim has complied in all respects with the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and all other laws governing copyrights as to the Competition rules and website.

52.    Maxim is the exclusive holder of all rights, title, and interest in and to the copyrights to its Copyrighted Works. Maxim has not granted any license or right to any person or entity, including Playboy, to use the Copyrighted Works except solely in association with the Competition.

53.    Maxim's exclusive use of the Copyrighted Works is vital to Maxim obtaining full value from the Competition.

## IV.    Playboy's Unauthorized Copying and Misappropriation of Maxim's Trade Secrets and Copyrighted Works

54.    Playboy has operated an online modeling contest since as early as 2023. Around that time, Playboy, like Maxim, also ran its contests on a third-party platform. Playboy operated its contests like traditional tournaments, replete with paid voting where individuals purchased votes through direct payments that were, at least in part, made as charitable donations.

55.    Before early 2025, Playboy did not have its own online competition platform or associated proprietary technologies, including user generated content media bundles, parallel voting tournaments, rolling entry tournaments, the overtime mechanic, and the robot voter feature.

56.    When Maxim launched its updated, innovative Competition in early 2025, Playboy became aware that such a proprietary platform could generate substantial revenue and brand equity for the contest organizer.

57.    Around early 2025, Playboy became aware of Maxim's Competition.

58.    Around early 2025, Playboy embarked on a scheme to copy, misappropriate, and reverse-engineer Maxim's novel and proprietary technologies and processes for running online

contests, including Maxim's Competition Mechanics, as well as to copy and create substantially similar derivative content from Maxim's Copyrighted Works.

59.    Playboy accomplished its unlawful scheme through a combination of accessing, copying, duplicating, downloading, and/or otherwise conveying the Competition Mechanics without authorization and in knowing violation of the Terms of Service and other restrictions imposed by law. Playboy, either directly or through its agents, accessed the Competition website, signed up as a dummy participant by completing Maxim's contest entry form under the false pretenses of being a prospective contestant in the Competition, and, having done so, gained access to Maxim's confidential and trade secret information.

60.    Playboy copied, in whole or in part, numerous elements of the design and structure of Maxim's Cover Girl website and the Cover Girl Dashboard through which participants engage in the Competition. From Maxim's Cover Girl website, Playboy copied, among other items, the landing page. From the Cover Girl Dashboard, Playboy copied, among other items, the sidebar and navigation structure, the competitions page, an alerts banner that notifies participants to "stay alert for scam votes," the footer, the votes page, the entrant profile page, the competitions page, the support page, the settings page, notifications settings, and the prizes page. Playboy also copied the design and structure of Maxim's mobile interface of its Cover Girl Competition.

61.    Playboy copied, in whole or in part, Maxim's Competition Mechanics, including user generated content media bundles, parallel voting tournaments, rolling entry tournaments, the overtime mechanic, and the robot voter feature.

62.    Maxim's Competition Mechanics and Competition dashboard and mobile interface are only available and accessible to individuals who register for accounts to participate

in the Competition, in the process agree to be bound by Maxim's Terms of Service for the

Competition prohibiting unauthorized access, copying, and exploitation of Maxim's intellectual

property, and then engage with the Competition pursuant to the Terms of Service.

63.    Playboy copied, in whole or in part, Maxim's rules for administering its contests,

competitions, and tournaments, including Maxim's Copyrighted Works. Language in Maxim's

rules is not boilerplate but consists of novel and proprietary drafting.

64.    Playboy copied, in whole or in part, its Master Rules and Promotion Rules from

Maxim's Master Rules and Promotion Rules, for which Maxim has a copyright registration.

Playboy's copying included, among other items:

      a.    Maxim's hybrid rule structure that pairs "Master Rules" with "Promotion

Rules" for specific promotions or competitions;

      b.    Maxim's competition structure, including a "bracket" format, "cohorts" of

entrants that can be "staggered" or placed into "groups," contests organized by "phases &

rounds," "resubmit[ssion]" of entries and "re-entry" of eliminated contestants, and "repeat

competitions";

      c.    Maxim's voting format, with daily "free votes," additional votes acquired

by purchasing digital content, "award votes," and "vote carry-overs & resets";

      d.    Maxim's scoring format consisting of a combination of judging and

voting;

      e.    Maxim's prizes including travel, car rentals, event tickets, gift cards, and

cash;

      f.    Maxim's prohibition against immoral conduct, including vulgarity,

intoxication, and sponsor disparagement; and

g.    Maxim's approach for notifying and validating winners.

65.    Playboy copied, in whole or in part, its The Great Playmate Search Inside Cover Promotion Rules from Maxim's Master Rules and Promotion Rules. Playboy's copying included, among other items, "overtime" extensions of voting rounds. Playboy's reference to "overtime" is vague, evidencing intent to replicate Maxim's proprietary mechanics without a technical understanding of how it operates.

66.    In using Maxim's Competition website, Playboy accepted and agreed to the Terms of Service, which restrict its use of Maxim's Competition Mechanics and Copyrighted Works. Playboy is bound to the Terms of Service and the Terms of Service is a valid and enforceable agreement between Maxim, on the one hand, and Playboy, on the other hand.

67.    By misappropriating Maxim's Competition Mechanics and Copyrighted Works, Playboy breached the restrictions of the Terms of Service and its promises and obligations to Maxim not to engage in such unauthorized conduct. Playboy's breach of the Terms of Service caused and continues to cause monetary damages and irreparable harm to Maxim.

68.    Playboy does not have Maxim's permission, license, or any other authorization to copy, create substantially similar derivative works, publish, republish, or make any other prohibited use of Maxim's Competition Mechanics and Copyrighted Works.

69.    Similarities between Playboy's and Maxim's products cannot be explained by coincidence or industry practice. Maxim's online competition mechanics, structure, and rules language are novel, non-obvious, and closely guarded. They could only have been obtained and then replicated—in some instances nearly verbatim—through Playboy's unauthorized access to Maxim's competitor dashboards and rules.

70.     Playboy used Maxim's misappropriated and copied information to develop a derivative online modeling contest. Playboy did so in a fraction of the time and cost Maxim had invested, while falsely marketing the copycat product as Playboy's own proprietary innovation.

71.     On August 4, 2025, with the benefit of Maxim's misappropriated Competition Mechanics and Copyrighted Works, Playboy launched its Great Playmate Search, including publishing rules for this competition and a site for hosting it. Playboy announced the launch of the Great Playmate Search in a press release issued that day. The administrator for Playboy's website platform and/or Playboy's technology partner in implementing its online contest is PaidVoting.

72.     On August 12, 2025, Playboy reported its Q2 2025 financial results and issued a concurrent press release. Ben Kohn, Playboy's Chief Executive Officer and President, is quoted in the press release as stating that Playboy "launched the Great Playmate Search, a paid fan-voting contest for a Playmate of the Month and the inside cover model for the March 2026 issue of Playboy, with registration off to a great start."

73.     On Playboy's Q2 2025 earnings call that day, Kohn made multiple statements regarding the company's newly-launched Great Playmate Search contest, including Playboy's economic model for the contest. Kohn stated:

> Look, paid voting, this is our first time doing this. What I would say, without getting into specific numbers, because they're in the multiple thousands already. But we signed up in the first few days, more than 50% of what we are expecting for the whole entire sign up period, which is eight weeks . . .
>
> But more importantly, what we're testing is how do we integrate this whole entire global Playboy ecosystem. So we have signed up our international additions, are licensing deals as affiliates to bring in women from around the world into the contest. We integrated with PSD, a significant licensing partners of ours for underwear, where they are marketing this contest and also participating in the giveaway and the price

selection. And we did the same thing with Honey Burdette. So I'm excited.

Based on other contests, this could be millions and millions of dollars of revenue for us. We have to execute on that. And we've done this in a model that's very similar to licensing, where we partnered with a technology partner, and we have an economic arrangement very similar to what our licensing business is on a gross margin basis.

74.     Voting in the Great Playmate Search opened on October 1, 2025 and has continued through the end of the year.

75.     During a November 12, 2025 earnings call for Q3 2025, Mr. Kohn stated:

our media and experiential business will be driven by new content and monetized through subscriptions, paid voting, community engagement and brand sponsorships. We've already begun testing new offerings with encouraging results. The relaunch of the Playboy Magazine has generated meaningful demand and our trial of the Great Playmate Search exceeded expectations with around 16,000 contestants entering, representing a combined social media following of more than 200 million. We've had over 1 million votes cast to date by over 100,000 users.

It's important to note that we have spent almost no money on this contest. The Playmate competition remains ongoing, and we plan to launch the next one in early 2026. Based on what we've learned, we expect paid voting to become a multimillion dollar annual business for us moving forward.

76.     Playboy's statements during its Q2 and Q3 2025 earnings calls publicly present the Great Playmate Search as Playboy's proprietary innovation, even though Playboy materially copied Maxim's mechanics, rules, and competition platform to create the Great Playmate Search. These statements are false and misleading representations of the origins of Playboy's platform to investors, contestants, and business partners. These statements confirm that Playboy is monetizing an online competition that it copied from Maxim and that Playboy is receiving lucrative revenue streams due to its misappropriation of Maxim's Competition Mechanics and Copyrighted Works, including from contest participants, licensing arrangements, and affiliate partnerships and integrations.

77. Playboy's misappropriation of Maxim's Competition Mechanics and Copyrighted Works has caused and continues to cause Maxim irreparable harm, including:

a. Trade secrets lost: Playboy's unauthorized replication collapses the contractual protections that prevent reverse-engineering of Maxim's system. Once these mechanics are made public through Playboy, Maxim's competitive advantage is permanently lost.

b. Business relationships undermined: Playboy knew or had reason to know that Maxim had business relationships with contestants and voters who participate in and interact with Maxim's online contests, including the Competition. Playboy intentionally interfered with these relationships, prevented contest participants from entering into business relationships with Maxim, and appropriated them for Playboy's own gain.

c. Authorship and market narrative destroyed: Playboy has usurped credit for market innovation and has sown confusion in the marketplace regarding operation of online contests. Maxim loses recognition for its unique system and the enterprise value attached to its leadership.

d. Brand contamination: Labeling contests as "Paid Voting" ties the category to "pay-to-win" practices widely described in reviews as scams. This association discredits Maxim's contests and reduces participation by contestants wary of reputational harm.

e. Consumer trust eroded: Playboy's hidden rules and defective vote tracking teach contestants that the system is deceptive. Once eroded, trust cannot be restored by monetary relief.

f. Flagship customer diverted: Playboy, a natural Maxim licensee, is instead an infringing competitor, undermining Maxim's business model.

20

**V.    Playboy's Unlawful and Unfair Competition with Maxim**

78.    Playboy impliedly or expressly represents to the public and to its contest entrants that its Great Playmate Search complies with federal and state laws and regulations governing gambling, lotteries, and sweepstakes; with Playboy's own rules; and with participant expectations about how online contests operate. Yet the Great Playmate Search has violated applicable requirements and run roughshod over consumer expectations.

79.    Playboy's contest rules are not on its Great Playmate Search Competition landing page and were not visible to contest participants until after they had registered and uploaded multiple photos to the contest. Playboy thus required contestant entry without first providing them access to Playboy's Contest Rules, in violation of applicable competition laws. Neither contest rules nor abbreviated rules are available on contestant profile pages or on Playboy's fan dashboard through which contestant voting takes place.

80.    Besides flouting contest laws and regulations, this also means that contestants do not have the opportunity to knowingly agree or consent to give Playboy the right to use, upload, or sell their UGC or to waive their rights to class action lawsuits. Playboy's platform misleadingly induces contestants to volunteer their valuable content before providing them with rules governing Playboy's use of that content or of the competition that contestants have already entered. Playboy intends to monetize on this UGC by distributing and selling it worldwide.

81.    U.S. and state competition laws regulate lotteries and gambling, which involve participants paying for the chance to win something of value. In other words, such regulated lotteries and gambling activities contain the following three elements: (a) consideration: participants give something of value, typically money or substantial effort, to enter; (b) chance: the winner is determined by random selection or luck; and (c) prizes: something of value awarded to the winner.

82.    To avoid lottery and gambling regulation, one of these three elements must be absent. Since legitimate contests include prizes, their sponsors or organizers look to eliminate either chance or consideration. To eliminate chance, organizers may structure the contest as a skill-based competition, where winners are judged based on skill. Doing so means judging based on and consistent with publicized criteria, as well as avoiding outcomes determined exclusively on random elements. To eliminate consideration, organizers may allow an equally accessible and free means of entry that does not require payment or purchase for entry.

83.    In copying Maxim's Competition Mechanics and Copyrighted Works, Playboy was either not aware of or ignored some of the technical intricacies of Maxim's platform for the Cover Girl Competition. Playboy's replication of Maxim's platform is confirmed by internal inconsistencies and contradictions within the Great Playmate Search, technical anomalies, and Playboy's disregard of applicable laws and regulations concerning gambling and lotteries.

84.    Playboy supplied votes to its contest participants in myriad ways that erase any skill-based aspect of Playboy's competition. Playboy gave models free votes equivalent to $30 merely for including links on their Instagram profiles to the Playboy competition. Playboy gave models free votes equivalent to $10 merely for linking to their Great Playmate Search competition profile from a story posted on Instagram. This diverts attention away from Maxim's Competition, particularly for models who were paid to replace links to Maxim with links to Playboy, and steers online competition revenue away from Maxim to Playboy.

85.    Votes appeared on at least one Playboy contestant's dashboard voting page before the competition voting period was live and before the contestant's profile was even published.

86.    Contestant profile pages misstated the number of photographs available for purchase through Playboy's copied version of UGC media bundles. For example, Playboy

misleadingly indicated that a contestant with only 19 photos uploaded had 74 photos available for purchase. To inflate the number of photos available, Playboy misleadingly duplicated the available UGC.

87. Playboy allowed voters to pay for votes without purchasing any contestant UGC or once all of a contestant's available UGC was purchased in violation of Playboy's published rules for The Great Playmate Search.

88. Playboy also allowed users to vote for a contestant multiple times using the same email address. This violates Playboy's competition rules, which allow only "One (1) Free Vote per person / email / Creator during each rolling twenty-four (24)-hour period" and provide that "excess votes are void for free votes (1 per day)." This also undermines any skill-based aspect of Playboy's competition.

89. Playboy counted or applied votes towards some competitions but not others.

90. Playboy continued to count votes for contestants who do not advance and for contest rounds that have ended.

91. Playboy may have failed to advance or eliminate contestants in accordance with Playboy's own published rules.

92. Playboy allowed participants to register for and enter the Great Playmate Search after the designated registration closing time of September 30, 2025 at 6 p.m. ET.

93. Playboy allowed users to purchase votes before the designated competition starting time of October 1, 2025 at 9 p.m. ET. Although paid for, Playboy may not be counting these votes towards competition rankings.

94.    Playboy also allowed users to make free votes before the designated competition starting time of October 1, 2025 at 9 p.m. ET. Although submitted prior to the start of a competition, Playboy may have been counting these votes towards competition rankings.

95.    Playboy's customer service chat bot provided erroneous responses to questions, such as about the timing of registration and voting.

96.    These technical issues and internal rule violations also eliminated any skill-based aspect of Playboy's competition.

97.    By skirting around applicable laws and consumer expectations regarding online contests generally and Playboy's Great Playmate Search specifically, Playboy has artificially minimized its operating costs, deceptively acquired contestants' UGC, and eroded public confidence and trust in Maxim's platform by association.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

98.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 97 above.

99.    Maxim developed and owns certain confidential and trade secret information associated with its platform for online competitions—the "Competition Mechanics" as alleged herein. Maxim's Competition Mechanics include, among other innovative methods, processes, and programs, parallel voting tournaments, rolling entry tournaments, personalized media bundle purchase voting, the overtime mechanic, and the robot voter feature. Maxim regards its Competition Mechanics as trade secrets.

100.    Maxim derives actual and substantial economic value from the secrecy of its Competition Mechanics, by which Maxim has increased monetization of its online competitions and grown its business revenues.

101.    Maxim has taken reasonable measures to restrict access to and protect the secrecy of its proprietary and trade secret Competition Mechanics, including the Competition Mechanics that Playboy has misappropriated.

102.    Playboy has, by the improper and unlawful means alleged above, improperly accessed, copied, duplicated, downloaded, and/or otherwise conveyed Maxim's Competition Mechanics.

103.    When Playboy did so, it was bound by Maxim's Terms of Service such that it knew or had reason to know that it was restricted from misusing and misappropriating the Competition Mechanics pursuant to the Terms of Service.

104.    Playboy's misappropriation of Maxim's trade secret confidential information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Maxim is entitled to an award of exemplary damages and reasonable attorneys' fees.

105.    As a direct and proximate result of Playboy's misconduct, Maxim has suffered and continues to suffer harm and substantial injury, including the theft of its proprietary trade secret and confidential information, lost profits, the diminution in value of its trade secrets and business, harm to its reputation, dilution of goodwill, and injury to its reputation. Playboy has been unjustly enriched by its misappropriation of Maxim's confidential information and trade secrets in an amount to be determined at trial.

106.    Because Maxim has suffered irreparable harm and Maxim's remedy at law is inadequate, Maxim seeks—in addition to damages—a preliminary injunction and permanent

injunctive relief to protect its trade secret confidential information related to Maxim's online competitions and contests, as well as Maxim's legitimate business interests. Maxim will continue to suffer irreparable harm absent injunctive relief.

## SECOND CAUSE OF ACTION
## Common Law Misappropriation of Trade Secrets

107.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 106 above.

108.    The rights and interests of Maxim in its Competition Mechanics, described above, constitute trade secrets as defined by the common law of the State of New York. Maxim regards its Competition Mechanics as trade secrets.

109.    Maxim developed and owns all of the rights, title, and interest in the confidential, proprietary, and trade secret information associated with its platform for online competitions as alleged herein. This includes, among other innovative methods, processes, and programs, user generated content media bundles, parallel voting tournaments, rolling entry tournaments, the overtime mechanic, and the robot voter feature.

110.    Maxim derives actual and substantial economic value from the secrecy of its Competition Mechanics, by which Maxim has increased monetization of its online competitions and grown its business revenues.

111.    Maxim has carefully guarded its trade secret Competition Mechanics, including the Competition Mechanics that Playboy has misappropriated. Maxim has taken reasonable steps to maintain the secrecy of this information.

112.    Playboy has, by the improper and unlawful means alleged above, improperly accessed, copied, duplicated, downloaded, and/or otherwise conveyed Maxim's Competition Mechanics.

113.    When Playboy did so, it was bound by Maxim's Terms of Service such that it knew or had reason to know that it was restricted from misusing and misappropriating the Competition Mechanics pursuant to the Terms of Service.

114.    Playboy knowingly, willfully, and maliciously violated the Terms of Service and breached Maxim's confidence by misappropriating Maxim's confidential and proprietary information related to its online competitions and contests for purposes of developing and marketing a copycat competitor product. Maxim is entitled to an award of exemplary damages and reasonable attorneys' fees pursuant to the Indemnification provisions of the Terms of Service.

115.    Playboy knew or had reason to know that Maxim's Competition Mechanics were acquired by improper means. Playboy has used Maxim's Competition Mechanics knowing or having reason to know that they were (a) derived from or through a person who had utilized improper means to acquire them; (b) acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) derived from or through a person who owed a duty to Maxim to maintain their secrecy or limit their use; or (d) before a material change of Playboy's position, knew or had reason to know that they were trade secrets and that knowledge of them had been acquired by accident or mistake.

116.    As a direct and proximate result of Playboy's misconduct, Maxim has suffered and continues to suffer harm and substantial injury, including the theft of its proprietary trade secret and confidential information, lost profits, the diminution in value of its trade secrets and business, harm to its reputation, dilution of goodwill, and injury to its reputation. Playboy has been unjustly enriched by its misappropriation of Maxim's confidential information and trade secrets in an amount to be determined at trial.

117.    Because Maxim has suffered irreparable harm and Maxim's remedy at law is inadequate, Maxim seeks—in addition to damages—a preliminary injunction and permanent injunctive relief to protect its trade secret confidential information related to Maxim's online competitions and contests, as well as Maxim's legitimate business interests. Maxim will continue to suffer irreparable harm absent injunctive relief.

### THIRD CAUSE OF ACTION
### Copyright Infringement Under the Copyright Act, 17 U.S.C. § 101 *et seq.*

118.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 117 above.

119.    Maxim is the owner of all copyright rights or has the right to assert copyright infringement claims for Maxim's Copyrighted Works, other works, and derivative works. Maxim has complied in all respects with the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and all other laws governing copyright.

120.    Playboy, through the actions complained of herein, has infringed and will continue to infringe on Maxim's Copyrighted Works, other works, and derivative works by using, copying, counterfeiting, distributing, or otherwise exploiting the same without a license to do so.

121.    As a direct result of Playboy's infringement, Maxim has sustained damages in an amount to be determined at trial. Pursuant to 17 U.S.C. §§ 502, 503, 504, and 505, Maxim is entitled to an award of actual damages, injunctive relief, the impoundment and destruction of the infringing materials, and its attorneys' fees and costs. Maxim is further entitled to statutory damages for infringement and willful infringement of Maxim's Copyrighted Works.

### FOURTH CAUSE OF ACTION
### Violation of the Digital Millenium Copyright Act, 17 U.S.C. § 1202 *et seq.*

122.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 121 above.

123.    Maxim's contest landing page (https://covergirl.maxim.com) contains this CMI:

©2025 MAXIM

124.    Maxim's Master Rules and Promotion Rules have this CMI:

© Pacific Digital Industries, Inc. DBA SweepstakesPros. All rights reserved. (ver. 20250106)

125.    Maxim's Cover Girl 2025 Competition Promotion Rules have this CMI:

© Pacific Digital Industries, Inc. DBA SweepstakesPros. All rights reserved. (ver. 20250106)

126.    Maxim is the assignee of SweepstakesPros.'s copyright rights in the Terms of Service.

127.    Playboy's Great Playmate Search landing page (https://contests.playboy.com/) has this CMI:

© 2025 Playboy.com, Inc. All rights reserved.

128.    Neither Playboy's Master Rules and Promotion Rules, The Great Playmate Search Inside Cover Promotion Rules, nor The Great Playmate Search Playmate Promotion Rules contain any CMI.

129.    Without Maxim's authorization or license, Playboy intentionally copied, in whole or in part, Maxim's Copyrighted Works and created derivative works based thereon.

130.    In doing so, Playboy intentionally removed Maxim's work from the context in which it was created and intentionally removed and altered Maxim's CMI. Playboy intentionally provided false CMI concerning works it copied or derived from Maxim's Copyrighted Works.

131.    Playboy knew or had reasonable grounds to know that its removal of Maxim's CMI would facilitate Playboy's unlawful acts by concealing that Playboy's The Great Playmate Search is an infringing, copied, and/or derivative work, being copied and/or derived from the Competition. Playboy's removal of Maxim's CMI, falsification of Maxim's CMI, and distribution of works bearing false CMI was done without Maxim's knowledge or authorization.

132.    Playboy distributed its Great Playmate Search with knowledge that doing so would induce, enable, facilitate, or conceal an infringement of Maxim's rights under the DMCA.

133.    Maxim has been injured and will continue to suffer injury as a result of Playboy's violations of the DMCA and is entitled to injunctive relief, impoundment of the infringing products, statutory and monetary damages, costs, and attorneys' fees.

134.    Maxim is currently unable to ascertain the full extent of the monetary damages Maxim has suffered as a result of said acts. To determine the full extent of such damages, including such profits of Playboy, as may be recoverable under Section 1203 of the DMCA, Maxim requires an accounting from Playboy of all monies generated from Playboy's wrongful falsification, alteration, and removal of Maxim's CMI. In the alternative, Maxim elects to recover statutory damages pursuant to Section 1203(c)(3) in a sum of not more than $25,000 from each Playboy for each violation of Section 1202.

## FIFTH CAUSE OF ACTION
### Breach of Contract

135.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 134 above.

136.    The Terms of Service is a binding contract between Maxim and Playboy, which is governed by New York law.

137.    By its conduct alleged above, Playboy failed to abide by its promises and obligations to refrain from misappropriating Maxim's proprietary and trade secret information related to its online modeling competitions and has breached the Intellectual Property Ownership and Use provisions of the Terms of Service.

138.    Playboy agreed to the Terms of Service in bad faith to obtain Maxim's ideas and information related to its online contests and competitions with the purpose of building a copycat competitor product.

139.    Maxim has performed its obligations under the Terms of Service and has satisfied all conditions precedent to bringing this action.

140.    As a direct and proximate result of Playboy's conduct, Maxim has suffered and continues to suffer irreparable harm and the loss of potential clients, dilution of goodwill, injury to its reputation, and devaluation of its business.

141.    Playboy's breach of contract has caused and will continue to cause Maxim substantial injury including, but not limited to, irreparable harm, actual damages, lost profits, harm to its reputation, and the diminution in value of its business. Playboy has been unjustly enriched by its actions in an amount to be determined at trial.

142.    Playboy's breach of contract was intentional, knowing, willful, malicious, fraudulent, and oppressive. Maxim is entitled to an award of exemplary damages and reasonable attorneys' fees pursuant to the Indemnification provision of the Terms of Service.

143.    Because Maxim has suffered irreparable harm and Maxim's remedy at law is inadequate, Maxim seeks—in addition to damages—a preliminary injunction and permanent

injunctive relief to protect its trade secret confidential information related to its online contests and competitions, as well as Maxim's legitimate business interests. Maxim will continue to suffer irreparable harm absent injunctive relief.

**SIXTH CAUSE OF ACTION**
**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**

144.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 143 above.

145.    The Terms of Service agreement between Maxim and Playboy imposes an obligation of good faith and fair dealing on Playboy.

146.    Playboy is obligated to deal fairly and in good faith with Maxim, including refraining from reducing the goodwill of Maxim, maintaining the secrecy of and refraining from misappropriating and unlawfully using and disclosing Maxim's proprietary trade secret and confidential information related to its online competitions and contests, and avoiding tortiously interfering with Maxim's business relationships.

147.    By the acts described above, Playboy breached these obligations by misappropriating and unlawfully using Maxim's proprietary trade secret and confidential information, including its Competition Mechanics and Copyrighted Works, to develop, operate, and market a competitor product and to solicit existing and prospective clients away from Maxim.

148.    Playboy acted in bad faith in breach of the implied covenant of good faith and fair dealing by entering into the Terms of Service for purposes of developing a copycat competitor product built with Maxim's confidential, proprietary, and copyrighted information.

149.    As a direct and proximate result of Playboy's breaches, Maxim was deprived of the benefits of the Terms of Service.

150.    Defendant's conduct, as alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. Maxim is entitled to an award of exemplary damages and reasonable attorneys' fees under the indemnification provisions of the Terms of Service.

151.    Playboy's misconduct has caused and will continue to cause Maxim irreparable harm and substantial injury, including actual damages, lost profits, harm to its reputation, and the diminution in value of its business.

152.    Playboy intends to continue its misconduct unless restrained and enjoined by this Court.

## SEVENTH CAUSE OF ACTION
### Tortious Interference with Business Relationships

153.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 152 above.

154.    Maxim had business relationships with online modeling competition entrants and voters, including individuals competing and voting in the Competition.

155.    Playboy, with full knowledge of Maxim's business relationships, intentionally interfered and continues to interfere with those relationships by replicating a competition platform using information, technologies, and rules that Playboy misappropriated and copied from Maxim.

156.    Playboy's unlawful and improper acts also prevented and continue to prevent third parties from entering into business relationships with Maxim.

157.    Playboy acted for a wrongful purpose and used dishonest, unfair, and improper means to breach Maxim's Terms of Service that prohibited it from misusing Maxim's intellectual property, misappropriate and copy Maxim's Competition Mechanics and Copyrighted Works, and compete unfairly with Maxim in this space.

158.    As a direct and proximate result of Playboy's misconduct, Playboy has injured and continues to injure Maxim by denying business to and diverting business away from Maxim, which Maxim would have otherwise had and from which it would have derived substantial profits.

159.    Playboy's tortious interference with Maxim's business relationships has caused and will continue to cause Maxim substantial injury, including irreparable harm, actual damages, lost profits, harm to its reputation, and the diminution in value of its business.

160.    Playboy's tortious interference with Maxim's business relationships was intentional, knowing, willful, malicious, fraudulent, and oppressive. Maxim is entitled to an award of exemplary damages and reasonable attorneys' fees under the indemnification provisions of the Terms of Service.

161.    Playboy intends to continue to interfere with Maxim's existing and prospective business relationships unless restrained and enjoined by this Court.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment

162.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 161 above.

163.    Playboy has been unjustly enriched by misappropriating and copying Maxim's Competition Mechanics and Copyrighted Work and by other misconduct to the detriment of Maxim's labors, business operations, and expenditures.

164.    Playboy has unlawfully taken and retained from Maxim the value of its proprietary trade secret and confidential information related to Maxim's online contests and competitions and existing and prospective business relationships, without just compensation to Maxim.

165.    As a direct and proximate result of Playboy's misconduct, Maxim has suffered and will continue to suffer monetary damages in an amount to be determined at trial along with irreparable harm.

166.    The circumstances surrounding Playboy's acts are such that equity and good conscience require Playboy to make full restitution to Maxim for Playboy's unjust enrichment.

167.    Playboy's conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive. Maxim is entitled to an award of exemplary damages and reasonable attorneys' fees under the indemnification provisions of the Terms of Service.

### NINTH CAUSE OF ACTION
### <u>Unfair Competition</u>

168.    Maxim realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 167 above.

169.    The rights and interests of Maxim in its confidential and proprietary information constitute trade secrets as defined by the Defend Trade Secrets Act and the common law of the State of New York.

170.    Because of Maxim's reliance on the use restrictions of the Terms of Service, Maxim provided Playboy with access to and knowledge of Maxim's proprietary trade secret confidential information related to its online contests and competitions.

171.    Playboy knowingly, willfully, and maliciously violated the Terms of Service and breached Maxim's confidence by misappropriating Maxim's proprietary trade secret and confidential information related to its online contests and competitions in order to unfairly develop, operate, and market a copycat competitor product.

172.    In doing so, Playboy misappropriated Maxim's labor, skills, expenditures, and goodwill, resulting in unfair deprivation of Maxim's ability to compete for participation,

engagement, and revenue in online modeling contests. Playboy acted in bad faith in doing so, by knowingly violating the use restrictions of the Terms of Service and by other means.

173.    Playboy further acted in bad faith and through wrongful means by skirting around applicable laws and regulations governing competitions and contests, deceiving contestants regarding their submission of UGC to Playboy, and lowering Playboy's costs of operation. This has also resulted in unfair deprivation of Maxim's ability to compete for participation, engagement, and revenue in online modeling contests.

174.    As a direct and proximate result of Playboy's misconduct, Maxim has suffered and continues to suffer irreparable harm, including the disruption of its business relationships, the loss of clients and potential clients, dilution of goodwill, injury to its reputation, misappropriation of its proprietary trade secret and confidential information, and the devaluation of its trade secrets and confidential information and business.

175.    Maxim has also suffered damages in the amount that it would have earned except for Playboy's unfair competition and wrongdoing.

## JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues so triable by right.

## DEMAND FOR RELIEF

Plaintiffs request that the Court find in its favor and against Defendant, and that the Court grant Plaintiffs the following relief:

a.    Damages as described in each of the above claims, in favor of Plaintiffs and against Defendant in amounts to be determined at trial;

b.    A preliminary and permanent injunction against Defendant to prevent the actual and threatened misappropriation, copying, and exploitation of Plaintiffs' confidential, proprietary, and trade secret information associated with the

36

Competition and Plaintiffs' other online contests and competitions on such terms as the Court deems reasonable;

c.      Punitive damages in an amount to be determined at trial;

d.      Pre-judgment and post-judgment interest, and Plaintiffs' attorneys' fees, costs, and other expenses incurred in this action; and

e.      Such other and further relief as the Court may deem just and proper under the circumstances.


Dated: January 20, 2026          CLARK SMITH VILLAZOR LLP
       New York, New York

                                 */s/ Christopher J. Clark*
                                 Christopher J. Clark
                                 Geoffrey H. Coll
                                 Leon Kotlyar
                                 666 Third Avenue, 21st Floor
                                 New York, NY 10017
                                 (212) 377-0850
                                 clark@csvllp.com
                                 geoffrey.coll@csvllp.com
                                 leon.kotlyar@csvllp.com

                                 *Counsel for Plaintiffs Maxim Inc.*
                                 *and Maxim Licensing, Inc.*