UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────

MAXIM INC. AND MAXIM LICENSING
INC.,

                    Plaintiffs,

          - against -

PLAYBOY, INC.,

                    Defendant.

─────────────────────────────────

26-cv-0530 (JGK)


MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiffs, Maxim Inc. and Maxim Licensing Inc. (col-
lectively, "Maxim"), bring this action against Playboy, Inc.
("Playboy"), seeking damages, preliminary and permanent injunc-
tive relief, punitive damages, pre-judgment and post-judgment
interest, attorney's fees, and costs. See Compl. 36-37, ECF
No. 1. Maxim's claims arise from Playboy's alleged reproduction
of the competition mechanics and architecture of Maxim's model-
ing contest, the "Maxim Cover Girl Competition" (the "Maxim
Competition"), which were allegedly used in Playboy's own model-
ing contest, the "Great Playmate Search" (the "Playmate
Search"). Id. ¶¶ 1-2, 10.

The plaintiffs plead nine causes of action: trade secret
misappropriation under the Defend Trade Secrets Act ("DTSA"), 18
U.S.C. § 1836 et seq. (Count I); common-law trade secret misap-
propriation (Count II); copyright infringement under the
Copyright Act, 17 U.S.C. § 101 et seq. (Count III); violation of
the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202

et seq. (Count IV); breach of contract (Count V); breach of the implied covenant of good faith and fair dealing (Count VI); tortious interference with business relationships (Count VII); unjust enrichment (Count VIII); and unfair competition (Count IX). See id. at 24-36.

On January 21, 2026, Maxim moved pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction enjoining Playboy from allegedly misappropriating or misusing Maxim's trade secrets and copyrighted information contained in the Maxim Competition. See ECF No. 5. For the reasons explained below, Maxim's motion is **denied**.

## I.

The Court finds the following facts and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).

## A.

Maxim is a multimedia lifestyle brand and publishing company that has run the Maxim Competition since 2018. Lewis Aff. ¶ 6, ECF No. 7. The Maxim Competition invites contestants from around the world to compete for an opportunity to appear on the cover of Maxim magazine and to win cash prizes. Id. ¶ 26. Prospective contestants register for the Maxim Competition through a website portal. Id. ¶ 28. All webpages of the Maxim Competition contain a link to the Competition Terms of Service, which

impose use restrictions regarding Maxim's intellectual property. Id. ¶ 29; ECF No. 7-3, Ex. C ("Terms of Service").

In 2025, Maxim redesigned the Maxim Competition and introduced allegedly novel elements, including parallel voting tournaments, rolling entry tournaments, overtime voting extensions, and robot voting. Lewis Aff. ¶¶ 7-9, 42. The redesigned Maxim Competition also uses "user-generated content media bundles" ("UGC"), in which Maxim allegedly uses proprietary algorithms to score and rank UGC, sell UGC in bundles, and use those sales to generate competition votes.[1] Id. ¶ 41. Maxim alleges that this system avoids the traditional "pay-to-win" contest model, in which votes are simply purchased. Id.

Maxim allegedly restricts access to its physical and computer systems to a small number of Maxim employees. Id. ¶ 45. Maxim also alleges that it has obtained copyright registrations for the Maxim Competition and contest rules. Id. ¶ 50. However, two of the five certificates of registration identify Pacific Digital Industries, Inc. ("Pacific Digital"), rather than Maxim, as the copyright claimant. See Maxim Master Rules and Promotion Rules (Revised January 6, 2025), Copyright Registration No. TX 9-552-774 (effective Jan. 8, 2026) (copyright claimant Pacific

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

Digital Industries, Inc., d/b/a SweepstakesPros); Promotion Rules 1 — MAXIM Cover Girl 2025 Competition, Copyright Registration No. TX 9-553-279 (effective Jan. 13, 2026) (copyright claimant Pacific Digital Industries, Inc., d/b/a SweepstakesPros). See ECF No. 49(a)-(e).

### B.

Playboy is a men's lifestyle and entertainment magazine founded in 1953 with a significant online presence. Riley Aff. ¶ 3, ECF No. 24-1. Playboy has run modeling competitions since the late 1970s, with winners often featured in Playboy publications and other Playboy promotions. Id. ¶ 4.

On August 4, 2025, Playboy launched its latest competition, the Playmate Search, with a third-party platform partner, Suroh Group LLC, which created the website platform and functionality for the competition. Crossman Aff. ¶¶ 2, 5, ECF No. 24-3. On December 16, 2025, the Playmate Search concluded, and the winner was announced. Id. ¶ 5. The Playmate Search used a competition mechanism that mirrored Playboy's previous competitions: contestants registered online, uploaded UGC to their profiles, and voters voted for contestants based on that UGC. Id. ¶ 3.

Maxim alleges that Playboy copied the competition mechanics of the Maxim Competition, including UGC media bundles, parallel voting tournaments, rolling entry tournaments, the overtime mechanic, and robot-voter features, among others. Lewis Aff. ¶ 60.

Maxim further alleges that Playboy accessed Maxim's proprietary competition mechanics by using the Maxim Competition website. Id. ¶ 65.

Maxim also alleges that the Playmate Search did not perfectly duplicate the Maxim Competition. For example, Maxim alleges that the Playmate Search required contestants to submit their UGC before providing them with the competition rules, thereby misleading contestants into forfeiting their intellectual property. Id. ¶¶ 77-79. Maxim further alleges that the Playmate Search eliminated skill-based aspects of the competition by providing contestants with free votes and allowing users to pay for votes, among other alleged irregularities and deficiencies. Id. ¶¶ 82-87.

On October 27, 2025, Maxim's principal, Justin Lewis, reached out to Playboy's CEO and expressed "excitement about [the Playmate Search's] potential to become a major revenue driver for Playboy." ECF No. 24-2, Ex. A ("Lewis October 27 Email"). In the same email, Lewis identified several issues with the Playmate Search and expressed a willingness to share Maxim's expertise to help Playboy diagnose and fix those issues and "build a partnership that turns [the Playmate Search] into a highly profitable and reputable platform." Id. Lewis did not mention any infringement or demand that Playboy cease the Playmate Search. See id.

On December 3, 2025, Lewis followed up with another email to "discuss how we can structure the next phase of [the Playmate Search] in a way that supports the broader Playboy brand." ECF No. 24-5, Ex. C ("Lewis December 3 Email"). Lewis proposed that Maxim would "operate [the Playmate Search] from end-to-end (tech, ops, admin) and handle the execution risk" and "charge a capitalizable fee for the generation of [the Playmate Search] magazines, which voters purchase to earn votes for contestants." Id.

Playboy eventually decided against pursuing the proposed partnership with Maxim for future competitions. Riley Aff. ¶ 11. Playboy states that, at no time during its communication or meetings with Maxim, did Lewis or anyone else from Maxim assert that Playboy had infringed or otherwise violated Maxim's rights. Id. ¶ 10. Playboy claims that it first learned of the alleged violations when Maxim filed this lawsuit. Id.

**II.**

To succeed on a motion for a preliminary injunction, a plaintiff must show, "(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of the hardships tips in the plaintiff's favor; and

(4) that the public interest would not be disserved by the issuance of an injunction." <u>Benihana, Inc. v. Benihana of Tokyo, LLC</u>, 784 F.3d 887, 895 (2d Cir. 2015).

**III.**

Maxim argues that it will suffer irreparable injury from the Playmate Search, including "loss of market leadership and market share, price erosion, and dissipation of goodwill." Pls.' Mem. in Supp. of Mot. ("Pls.' Mem.") 25–27, ECF No. 6.

Irreparable harm is the "sine qua non for preliminary injunctive relief." <u>USA Recycling, Inc. v. Town of Babylon</u>, 66 F.3d 1272, 1295 (2d Cir. 1995). "As such, the moving party must first demonstrate that irreparable harm would be likely in the absence of a preliminary injunction before the other requirements for the issuance of a preliminary injunction will be considered." <u>JBR, Inc. v. Keurig Green Mountain, Inc.</u>, 618 F. App'x 31, 33 (2d Cir. 2015) (summary order) (citing <u>Rodriguez ex rel. Rodriguez v. DeBuono</u>, 175 F.3d 227, 234 (2d Cir. 1998)).

As the Court of Appeals for the Second Circuit has explained:

> Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action . . . . Significant delay in applying for injunctive relief . . . tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial,

7

and such delay alone may justify denial of a preliminary injunction for trademark infringement.

Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).

In this case, the timing of Maxim's motion substantially undermines its claim of irreparable harm. The Playmate Search began on August 4, 2025, and concluded on December 16, 2025. Crossman Aff. ¶ 5. Maxim knew of the Playmate Search no later than October 27, 2025, when Lewis emailed Playboy to express his "excitement" about becoming involved in operating the competition. See October 27 Lewis Email. Yet Maxim did not move for a preliminary injunction until January 21, 2026 — nearly five months after the Playmate Search began, almost three months after Maxim concededly knew of it, and more than one month after the competition had ended.

That delay is difficult to reconcile with Maxim's assertion that immediate injunctive relief is necessary to prevent irreparable harm. This is especially so because Lewis's contemporaneous communications with Playboy did not assert infringement, demand that Playboy cease the Playmate Search, or otherwise indicate that Maxim viewed the competition as an urgent threat to its business.[2] To the contrary, Lewis expressed

---

[2] In its reply, Maxim characterizes Lewis's emails and meetings with Playboy as "good-faith attempts to investigate Playboy's infringement" and a "diligent pursuit of settlement negotiation." Pls.' Reply 9, ECF No. 26. But the contemporaneous record does not support that characterization. Those communications are

enthusiasm about the Playmate Search's revenue potential and proposed that Maxim operate future phases of the competition. Maxim's delay, coupled with its effort to partner with Playboy rather than stop the Playmate Search, shows that any alleged injury was not so imminent or irreparable as to warrant the extraordinary remedy of a preliminary injunction. See Richard A. Leslie Co. v. Birdie, LLC, No. 07-cv-5933, 2007 WL 4245847, at *2, (S.D.N.Y. Nov. 26, 2007) (three-month delay in moving for preliminary injunction was sufficiently long, in and of itself, to warrant denial); Kim v. CIMG Inc., No. 24-cv-7485, 2025 WL 833074, at *2 (S.D.N.Y. Feb. 13, 2025) (same).

Accordingly, because Maxim has failed to show a likelihood of irreparable harm, its motion for preliminary injunction is **denied**. See Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 68 (2d Cir. 2007) ("The finding of no showing of irreparable harm is dispositive.").

## IV.

In any event, Maxim also cannot show a likelihood of success on any of its claims.

### A. Trade Secret Misappropriation (Counts I and II)

Maxim alleges that Playboy accessed and copied the competition mechanics of the Maxim Competition, which Maxim claims are

---

more consistent with a business-development effort than with an investigation into infringement or a settlement negotiation.

9

trade secrets, through improper and unlawful means in violation of Maxim's Terms of Service. Compl. ¶¶ 98–117.

To state a trade-secrets misappropriation claim under the DTSA, a plaintiff must plausibly allege that (1) the plaintiff possessed a trade secret, and (2) the defendant misappropriated that trade secret. 18 U.S.C. § 1836(b)(1); ExpertConnect, L.L.C. v. Fowler, No. 18-cv-4828, 2019 WL 3004161, at *3 (S.D.N.Y. July 10, 2019). "If a complaint sufficiently alleges a claim under the DTSA, it also sufficiently pleads misappropriation of trade secrets under New York law." Kraus USA, Inc. v. Magarik, No. 17-cv-6541, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020).

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." Speedry Chem. Prods., Inc. v. Carter's Ink Co., 306 F.2d 328, 331 (2d Cir. 1962). Accordingly, in order to state a claim for trade secret misappropriation, "courts require that the possessor of a trade secret take reasonable measures to protect its secrecy." Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1063 (2d Cir. 1985). "Absent such measures," the information "will cease to be a trade secret and will lose the protections of trade secret law." Id.

In this case, the master rules for the Maxim Competition, which set out the competition mechanics, are publicly available

without any access restrictions. See Ex. A; MAXIM Cover Girl, https://perma.cc/S6P6-VVYD. The public availability of the master rules weighs substantially against Maxim's likelihood of success on its trade-secret-misappropriation claim because the asserted competition mechanics were not kept secret and therefore are unlikely to qualify as trade secrets. See Defiance Button, 759 F.2d at 1063.

Maxim responds that, although the master rules are publicly available, Playboy could have learned the "functionality" of the Maxim Competition only by participating in the contest through dummy participants, instead of merely browsing the website. Maxim Reply 2. Maxim argues that it took reasonable measures to protect the secrecy of that "functionality" because participants were required, before participating in the competition, to agree to the Terms of Service, which state that "[y]ou shall not use, copy, distribute, or exploit any of the Website Content in any manner without our prior written permission." Id.; see Terms of Service.

But Maxim still fails to show that participants were required to keep the functionality of the Maxim Competition confidential. Although the Terms of Service prohibit users from using, copying, distributing, or exploiting "Website Content" without Maxim's prior written permission, that provision is not

11

equivalent to a nondisclosure agreement of the competition functionality.

To the extent the functionality of the Maxim Competition was apparent to users who participated in the contest, Maxim's failure to require a nondisclosure agreement, licensing agreement, or other confidentiality obligation weighs strongly against finding that Maxim took reasonable measures to preserve secrecy of the competition mechanics, or "functionality," and therefore had a trade secret in the first place. See Mason v. Amtrust Fin. Servs., Inc., 848 F. App'x 447, 450 (2d Cir. 2021) (summary order) (finding no reasonable measures where the plaintiff failed to "execut[e] a nondisclosure or licensing agreement" or otherwise "stipulat[e]" that the information was proprietary); see also Turret Labs USA, Inc. v. CargoSprint, LLC, No. 21-952, 2022 WL 701161, at *3 (2d Cir. Mar. 9, 2022) (summary order) (same).

### B. Copyright Infringement (Count III)

Maxim also alleges that the Playmate Search infringed on Maxim's copyrights because of the "striking similarities" between Maxim's copyrighted works and Playboy's allegedly derivative content. Pls.' Mem. 18–19.

Copyright infringement is established by proving "ownership of a valid copyright" and "copying of constituent elements of

12

the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, (1991).

As an initial matter, Certificates of Registration TX 9-552-774 ("'744 Certificate"), ECF No. 24-7, and TX 9-553-279 ("'279 Certificate"), ECF No. 24-8, identify Pacific Digital as the copyright claimant, rather than Maxim. Under 17 U.S.C. § 501(b), only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." Pacific Digital is not a party to this action.

Maxim points to Lewis's affidavit and argues that Maxim is the assignee of the copyrights under the '773 and the '279 Certificates. Maxim Reply 4 n.6; Lewis Aff. ¶ 37. But that does not resolve the standing problem at this stage. Even assuming that Maxim received an assignment of the copyrights, "a copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them." ABKCO Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2d Cir. 1991). Maxim has not shown that any assignment from Pacific Digital expressly included the allegedly accrued infringement claims. Accordingly, on the present record, Maxim has not shown that it is likely to

establish standing to assert copyright infringement claims based on the copyrights under the '773 and '279 Certificates.

As to the remaining three copyrights, Maxim fails to show that the alleged infringement concerns protected expression rather than unprotectable ideas or concepts. It is well established that "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976). Consistent with that principle, the Court of Appeals for the Second Circuit has explained that copyright protection for contest rules extends only to the "arrangement of the rules and the manner of their presentation, and not their content." Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co., 513 F.2d 1183, 1188 (2d Cir. 1975) (holding that there was no infringement where the defendant published a similar rulebook for a game involving the same subject matter); Rodriguez v. Heidi Klum Co., No. 05-cv-10218, 2008 WL 4449416, at *5 (S.D.N.Y. Sept. 30, 2008) (holding that the use of a panel of judges, a design workroom, a specific number of contestants, and professional models flowed from the uncopyrightable idea of a fashion-design reality show and were therefore unprotectable "scènes à faire").

In this case, Maxim alleges that the Playmate Search in-fringed Maxim's "unique contest mechanics, including Maxim's competition structure, Maxim's voting format, Maxim's scoring format, Maxim's prizes, Maxim's prohibition against immoral con-duct, and Maxim's approach for notifying and validating winners." Pls.' Mem. 19. But those alleged similarities concern the structure, mechanics, content, and "scènes à faire" of the competition, not the particular expressive arrangement or presentation of Maxim's copyrighted materials. Maxim has not shown that Playboy copied the language, arrangement, or other protectible expression in Maxim's rules or promotional materi-als. Because copyright law does not protect the underlying ideas, systems, procedures, or contest mechanics embodied in Maxim's materials, Maxim has not shown a likelihood of success on its copyright infringement claim. See Affiliated Hosp., 513 F.2d at 1188.

### C. DMCA (Count IV)

Maxim similarly alleges that Playboy intentionally removed Maxim's Copyright Management Information ("CMI") "as part of its scheme to duplicate Maxim's proprietary, confidential, and copy-righted information." Pls.' Mem. 19.

A party that places its own CMI on a separate work is not liable under § 1202(a) merely because that work allegedly incor-porates or derives from the copyright holder's work. See We the

15

Protesters, Inc. v. Sinyangwe, 724 F. Supp. 3d 281, 296 (S.D.N.Y. 2024) (collecting cases); Park v. Skidmore, Owings & Merrill LLP, No. 17-cv-4473, 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019) (holding that the defendant did not violate Section 1202(a) by claiming authorship even over a work that was allegedly an improper derivative of the plaintiff's design).

That is the scenario alleged in this case. Maxim does not contend that Playboy removed or altered CMI from Maxim's own copyrighted works. Rather, Maxim alleges that Playboy created an derivative or infringing work and failed to include Maxim's CMI on that separate work. That allegation is insufficient to sustain a claim under the DMCA. See We the Protesters, 724 F. Supp. 3d at 296.

### D. Contract Claims (Counts V & VI)

Maxim alleges that Playboy breached Maxim's Terms of Service or the implied covenant of good faith and fair dealing through Playboy's "extraction and subsequent replication" of Maxim's competition and copyrighted works without permission.[3] Pls.' Mem. 20-21. Maxim argues that Playboy was bound by Maxim's Terms of Service because Playboy used a dummy account to

---

[3] "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." Harris v. Provident Life & Acc. Ins., 310 F.3d 73, 80 (2d Cir. 2002). Accordingly, Maxim's breach-of-contract claim and implied-covenant claim are analyzed together.

register for the Maxim Competition and thereby assented to the Terms of Service. Id. at 20.

As an initial matter, to the extent Maxim's contract claim is based on the same theory as its copyright-infringement claim, the contract claim is preempted. See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32, 48-49 (2d Cir. 2019).

Additionally, Maxim's contract-formation theory depends on speculation that Playboy used a dummy account to participate in the Maxim Competition. Maxim does not identify the alleged dummy account, offer evidence tying any such account to Playboy, or point to any irregularity in the Maxim Competition's registration records suggesting that Playboy registered or participated through a dummy account. As explained above, because the Terms of Service did not restrict participants from discussing or disclosing their experience with the Maxim Competition, Playboy could have learned about the competition mechanics or functionality through other means, without itself registering for the competition through a dummy account. There is, in short, insufficient information to show that Maxim is likely to succeed on the breach-of-contract claim.

If Maxim's contract-formation theory rests merely on Playboy's alleged browsing of the Maxim Competition website, that theory would fare no better.

17

In Specht v. Netscape Communications Corp., the Court of Appeals for the Second Circuit held that the plaintiffs were not bound by a license agreement accessible only by scrolling down to the next screen because the plaintiffs "were responding to an offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms." 306 F.3d 17, 31 (2d Cir. 2002). Similarly, in Hines v. Overstock.com, Inc., the district court held that the defendant failed to show constructive notice where the defendant asserted, in conclusory fashion, that an individual accepted the website's terms and conditions by accessing the website, but "crucially" did not explain how a user such as the plaintiff was made aware of those terms and conditions. 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), aff'd, 380 F. App'x 22 (2d Cir. 2010).

In this case, mere browsing of the Maxim Competition website would not establish assent to the Terms of Service. A user could view the Maxim Competition website without seeing the content of the Terms of Service unless the user affirmatively clicked on the hyperlink. See MAXIM Cover Girl, https://perma.cc/S6P6-VVYD. Similar to the license agreement in Specht, if not more so, a hyperlink to the Terms of Service at the bottom of the webpage, without the terms being directly displayed or otherwise brought to the user's attention, does not

18

provide "immediately visible notice" of the relevant terms or require an "unambiguous manifestation of assent." 306 F.3d at 31. Accordingly, Maxim has not shown that an ordinary website visitor would be bound by the Terms of Service merely by browsing the site.

Accordingly, Maxim has not shown that its contract-based claims are likely to succeed on the merits.

### E. Tortious Interference with Business Relations (Count VII)

Maxim argues that Playboy interfered with Maxim's existing and prospective relationships with contestants by allegedly misappropriating Maxim's trade secrets and attracting those contestants to Playboy. Pls.' Mem. 21.

To state a claim for tortious interference with business relations under New York law, the plaintiff must allege that "(1) it had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Navajo Air, LLC v. Crye Precision, LLC, 318 F. Supp. 3d 640, 652-53 (S.D.N.Y. 2018).

In this case, Maxim's theory of a wrongful purpose or used dishonest, unfair, or improper means rests on the same alleged trade-secret misappropriation and copyright infringement that support its other claims. As explained above, Maxim has not

19

shown a likelihood of success on either theory. Accordingly, Maxim has not shown a likelihood of success on its claim that Playboy used dishonest, unfair, or improper means to interfere with Maxim's alleged business relationships.

### F. Unjust Enrichment (Count VIII)

Maxim argues that Playboy was unjustly enriched by using Maxim's allegedly "misappropriated and copied technologies and processes." Pls.' Mem. 22. However, as the New York Court of Appeals has cautioned, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). In this case, Maxim's unjust-enrichment claim rests on the same alleged conduct as its trade-secret-misappropriation and copyright-infringement claims. See Pls.' Mem. 22; Compl. ¶¶ 162-67. Because the unjust-enrichment claim merely repackages those claims and does not depend on any distinct facts or theory of recovery, the claim is unavailable. Maxim has therefore failed to show a likelihood of success on its unjust-enrichment claim.

### G. Unfair Competition (Count IX)

Lastly, Maxim argues that Playboy's alleged misappropriation of the Maxim Competition's competition mechanics gives rise to an unfair-competition claim. Pls.' Mem. 23-25.

20

However, Maxim's unfair-competition claim is premised on Playboy's alleged misappropriation of Maxim's trade secrets and copying of Maxim's copyrighted materials. See Pls.' Mem. 23-24; Compl. ¶¶ 162-67. For the reasons explained above, Maxim has not shown a likelihood of success on either theory. Therefore, Maxim has not shown a likelihood of success on its unfair-competition claim.

## V.

Finally, the balance of the hardship does not tip in Maxim's favor, and the plaintiff has failed to show that the public interest would be served by the issuance of an injunction.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, Maxim's motion for a preliminary injunction is **denied**.

The Clerk is directed to close ECF No. 5 in this case.

SO ORDERED.
Dated:    New York, New York
          May 13, 2026

_____
John G. Koeltl
United States District Judge

21